# IN THE COURT OF CHANCERY FOR THE STATE OF DELAWARE

RICHARD PARKS and STEVEN PARKS,  )
                                      )

          Plaintiffs,  )
                                        )

          v.  )          C.A. No. 2021-0988-SG
                                        )

HORIZON HOLDINGS, LLC,  )
PARKS MANUFACTURING, LLC a/k/a  )
PMI OPCO, LLC, and  )
PMI HOLDCO, LLC  )
                                        )

          Defendants.  )
                                        )

_____)
                                        )

HORIZON HOLDINGS, LLC,  )
PARKS MANUFACTURING, LLC a/k/a  )
PMI OPCO, LLC, and  )
PMI HOLDCO, LLC  )
                                        )

          Counterclaim-Plaintiffs,  )
                                        )

          v.  )

RICHARD PARKS and STEVEN PARKS,  )
                                        )

          Counterclaim-Defendants.  )

## MEMORANDUM OPINION

Date Submitted: June 21, 2022
Date Decided: July 20, 2022

Thomas V. Ayala and Sally E. Veghte, of KLEHR HARRISON HARVEY BRANZBURG LLP, Wilmington, Delaware, *Attorneys for Plaintiffs-Counterclaim Defendants Richard and Steven Parks*.

Scott B. Czerwonka and Andrea S. Brooks, of WILKS LAW, LLC, Wilmington, Delaware, *Attorneys for Defendants-Counterclaim Plaintiffs Horizon Holdings, LLC, PMI HoldCo, LLC, and Parks Manufacturing, LLC.*

**GLASSCOCK, Vice Chancellor**

Parties to an agreement may desire to bind themselves contractually in a way prohibited by the jurisdiction in which they operate, or in a manner unenforceable under its laws. For instance, players may wish to contractually agree to pay a gambling debt incurred in favor of the winner in a poker game. Such debts are uncollectable under their home state law. They agree, in their contract, that the law of Nevada, rather than home state law, will govern their contract, and consent to jurisdiction of Nevada courts. Nonetheless, the losers stiff the winner and refuse to redeem his chips; he then sues them in Nevada. Should the court there apply Nevada law, or the home state law?

This scenario plays out commonly in this Court in the realm, not of gambling debts, but of restrictions on employment or on the conduct of business. A number of states prohibit covenants not to compete or similar limitations on transaction of business, on public policy grounds; under Delaware law such covenants are generally enforceable. What if the parties agree to be bound, not by home state law, but by the law of Delaware? It is impossible to speak categorically, because the facts of each situation are unique, but in a number of cases,[1] Delaware courts, despite our state's strong contractarian bent, have refused in such a scenario to enforce

---

[1] *See, e.g., Ascension Ins. Holdings, LLC v. Underwood,* 2015 WL 356002, at *5 (Del. Ch. Jan. 28, 2015); *Focus Fin. Partners, LLC v. Holsopple*, 241 A.3d 784, 824 (Del. Ch. 2020).

covenants repugnant to the law of the state which is most concerned with the contract, with our courts following the Restatement of Conflict of Laws.[2]

The parties to the instant action have put before me the question of choice of law via cross-motions for partial summary judgment. The scenario is a variation of that laid out above, involving the sale of assets of an Oklahoma boat-building company, the (now-terminated) employment of the sellers by the Delaware LLC created by the buyer to facilitate the deal, and the resulting membership of those sellers—the Plaintiffs here—in a second LLC affiliated with the buyer, subject to restrictive covenants which would be unenforceable—at least in part—under the laws of the Plaintiffs' home state, Oklahoma. The Plaintiffs, sellers of the business and former employees of the boat-building company, are now in the pool-manufacturing business. The parties to the contracts involved purported to adopt Delaware law. In order to determine the applicable law, I must evaluate the pertinent transaction as a whole, including the sale of the Oklahoma corporation's assets, employment of the principals of the seller, and those principals' resulting investment in an affiliate of the buyer. I apply the Restatement analysis; the results, explained below, require application of Delaware law. Briefly, while the relevant contracts involve covenants not to compete, on the current record there is no serious allegation

---

[2] RESTATEMENT (SECOND) OF CONFLICT OF LAWS (AM. LAW. INST. 1971) [hereinafter "Restatement"].

that the Plaintiffs are in competition that would violate the pertinent covenants, presuming they are enforceable. I need not determine which state's law would apply to the hypothetical issue of breach of the noncompetes. Nonsolicitation covenants preventing poaching of company employees are at issue; such covenants are enforceable under the laws of both Delaware and Oklahoma; thus, I find no reason to dishonor the parties' express choice, and Delaware law will apply.

The remaining choice of law question involves whether covenants not to interfere in the business sold, embodied in the Operating Agreement of a Delaware LLC created to facilitate the transaction, are to be assessed under the law of Delaware or Oklahoma. The analysis below answers this question in favor of Delaware law.

## I. BACKGROUND

This matter is before me on cross-motions for partial summary judgment.[3] The parties have narrowed the issues to be decided in this expedited Memorandum Opinion to a primary question of choice of law and a secondary question of the enforceability of certain restrictive covenants contained in agreements between the

---

[3] The parties submitted the issues for resolution on cross-motions for partial summary judgment following briefing in support of cross-motions for preliminary injunction. I have relied on this briefing in outlining the facts and conducting my analysis, and have endeavored to limit the facts herein to those only which are not in dispute. *See* Opening Br. Supp. Mot. for Prelim. Inj., Dkt. No. 81 [hereinafter "Defs. OB"]; Pls. Richard Parks, et al.'s Opening Br. Supp. Mot. for Prelim. Inj., Dkt. No. 80 [hereinafter "Pls. OB"]; Defs.' Answering Br. Supp. Mot. Prelim. Inj., Dkt. No. 88; Pls. Steven Parks, et al.'s Br. Opp'n to Defs.' Horizon Holdings, LLC, et al.'s Mot. for Prelim. Inj., Dkt. No. 89.

parties to this action, depending on what law applies. I am able to resolve the first question; the second awaits a more developed record.

The Plaintiffs-Counterclaim Defendants in this action are two brothers, Richard and Steven Parks (the "Plaintiffs") who along with others sold a family business to a private investment firm, Horizon Holdings, LLC, a California limited liability company and one of the Defendants-Counterclaim Plaintiffs ("Horizon").[4] The other two Defendants-Counterclaim Plaintiffs in this action are two Delaware limited liability companies: Parks Manufacturing, LLC ("Parks LLC") and PMI HoldCo, LLC ("PMI LLC"), both of which have a principal place of business of Oklahoma.[5] Horizon, Parks LLC, and PMI LLC are referred to herein as the "Defendants." The family business purchased was at that time called Parks Manufacturing, Inc. ("Parks Inc."), an Oklahoma corporation in the boat building business.[6]

A number of documents supported the transaction by which Parks LLC acquired the assets of Parks Inc. (the "Transaction").[7] Among these were a Noncompetition, Nonsolicitation, Noninterference and Confidentiality Agreement (the "Noncompete Agreement") (each of the Plaintiffs signed a separate

---

[4] *See, e.g.*, Defs. OB 5–6; Verified Compl. ¶ 2, Dkt. No. 1.
[5] Defs. OB 5–6; *see* Defs. Answer to Verified Compl., Affirmative Defenses, and Verified Countercls. ¶ 7, Dkt. No. 12.
[6] *See* Pls. Richard Parks, et al.'s Aff. of Steven Parks Supp. Mot. for Prelim. Inj., Ex. 1, at PARKS MANUFACTURING0000001 (preamble) [such exhibit hereinafter "APA"].
[7] *See, e.g.*, Pls. OB 6–18 (discussing many of the documents in detail).

Noncompete Agreement, though the pertinent terms are substantively identical) and the Operating Agreement of PMI LLC (the "Operating Agreement") (a singular agreement signed by both Plaintiffs, in addition to others, as members).[8] I refer to the Operating Agreement together with the Noncompete Agreement as the "Agreements."

The Agreements each contain restrictive covenants that the Defendants argue are binding upon the Plaintiffs. The Plaintiffs, for their part, seek a declaratory judgment that the Agreements are not enforceable against them,[9] primarily because they believe that Oklahoma public policy prevents the Agreements from being enforceable against "Oklahoma residents working in Oklahoma."[10]

Although plenary claims[11] and additional motion practice[12] have been filed in this action, a sole issue has been expedited and is here addressed: the question of applicable law—whether stemming from Delaware or Oklahoma—which in turn

---

[8] *See id.* at 8–11 (discussing the Noncompete Agreement); *id.* at 14–18 (discussing the Operating Agreement).

[9] Verified Compl. ¶¶ 12–20, Dkt. No. 1 (the second instance of paragraphs 12 through 20 in the Complaint). I note that the Complaint itself refers only to those restrictive clauses contained in the Operating Agreement, but the parties have extensively briefed and argued as to the restrictive clauses contained in the Noncompete Agreement as well.

[10] *Id.* ¶ 19 (the second instance of a paragraph 19 in the Complaint).

[11] *See generally* Verified Compl., Dkt. No. 1.

[12] *See, e.g.,* Def.-Countercl. Pls.' Mot. (I) To Enforce This Ct.'s April 14 Status Quo Order, (II) For an Order Holding Pls.-Countercl. Defs. In Contempt and (III) For Sanctions, Dkt. No. 95.

will impact the enforceability of the covenants at issue.[13]  Addressing these questions requires a more in-depth review of the Transaction and the Agreements.

I note, also, the need for this Memorandum Opinion to avoid the advisory. The Plaintiffs in particular have sought for me to rule upon the general enforceability of the covenants at issue.[14]  This I clearly cannot do.  At present, the following questions appear to be ripe before me: (1) the law applicable to the nonsolicit provisions as relates to employee solicitation (the "Employee Nonsolicit Provisions");[15] (2) the law applicable to the noninterference provisions of the Operating Agreement as relates to the common "supply chain" usage of suppliers by both the Plaintiffs' current business and the business of Parks LLC (the "Noninterference Supply Chain Provisions");[16] and (3) the law applicable to the nonsolicit and noninterference provisions of the Operating Agreement as relates to Plaintiff Steven Parks's marketing of a boat dealership in Texas that sells both Defendants' boats and competitor boats (the "Noninterference Marketing Provisions").[17]

---

[13] Am. Joint Mem. Regarding Procedural Posture for Addressing Restrictive Covenants and Stipulation, Dkt. No. 107.

[14] Joint Mem. Regarding Procedural Posture for Addressing Restrictive Covenants 5, Dkt. No. 94.

[15] *See, e.g.*, Defs. OB 53–54 (identifying employee solicitation as an issue).

[16] *See id.* at 54 (identifying supply chain interference issues as potentially violative of the restrictive covenants).

[17] *See, e.g., id.* at 54–55 (identifying Steven Parks's "marketing the sale of a boat dealership (Austin Boats) in Texas" as a purported issue under the restrictive covenants).

As a preliminary matter, I note that although the covenants not to compete with the business sold have been discussed and briefed, there has been no serious contention that the Plaintiffs' *current* activities—engaging in a fiberglass pool building business called Grand Pools—conflict with the noncompete provisions in either of the pertinent Agreements at this stage.[18]  Accordingly, I need not discuss the hypothetical issue of choice of law applicable to those covenants.  I now turn to those parts of the Agreements pertinent to the choice of law with respect to the covenants currently in play.

*A. The Agreements and the Background of the Transaction*

The Noncompete Agreement contains the following restrictive covenants:

3. **Nonsolicitation.** [The Plaintiffs] shall not during the Restrictive Period, directly or indirectly: (a) solicit for [the Plaintiffs] or any other Person, business from any customers, clients or accounts of Purchaser, except on behalf of Purchaser while employed by Purchaser; (b) solicit for [the Plaintiffs] or any other Person, any active prospective customers, clients or accounts of Purchaser, except on behalf of Purchaser while employed by Purchaser; or (c) solicit, employ, retain as a consultant, interfere with or attempt to entice away from Purchaser any employee or former employee of Purchaser who was employed by Purchaser prior to the Closing Date and who has agreed to be, or has been, employed or retained by Purchaser within six (6) months prior to such solicitation, employment, retention, interference or enticement.

4. **Noninterference**.  [The Plaintiffs] shall not during the Restrictive Period, directly or indirectly: (a) encourage, in any way or for any reason, any customer, client or account of Purchaser, to sever or alter the relationship of

---

[18] There has been no small amount of briefing regarding the pontoon boat furniture supply company the Plaintiffs considered starting prior to the termination of their employment with Horizon.  That alleged competitive activity will be analyzed in the plenary phase of this action.

8

such customer, client or account with Purchaser; (b) discourage, in any way or for any reason, any active prospective customers, clients or accounts of Purchaser from becoming a customer, client or account of Purchaser; (c) aid any other Person attempting to take customers, clients or accounts from Purchaser; (d) aid any other Person in discouraging, in any way or for any reason, any active prospective customers, clients or accounts of Purchaser from becoming a customer, client or account of Purchaser; (e) serve or work, outside of [the Plaintiffs'] employment with Purchaser, in any way for any customers, clients or accounts of Purchaser . . . .[19]

The Operating Agreement contains the following restrictive covenants:

8.9 <u>Nonsolicitation</u>. No Member[20] or Member's Equityholder shall during the Restrictive Period, directly or indirectly: (a) solicit for such Member or any other Person, business from any customers, clients, dealers, employees, suppliers or accounts of the Business; (b) solicit for such Member or any other Person any active prospective customers, clients, dealers, employees, suppliers or accounts of the Business; or (c) solicit, employ, retain as a consultant, interfere with or attempt to entice away from the Company any employee or former employee of the Company who was employed by the Company within the six (6) months prior to the closing date of the sale of such Member's Units, as determined by the Company at its reasonable discretion.

8.10 <u>Noninterference</u>. No Member or Member's Equityholder shall, during the Restrictive Period, directly or indirectly: (a) encourage, in any way or for any reason, any customer, client, dealer, supplier, or account of the Business, to sever or alter the relationship of such customer, client, dealer, supplier or account with the Business; (b) discourage, in any way or for any reason, any active prospective customers, clients, dealers, suppliers or accounts of the Business, from becoming a customer, client, dealer, supplier or account of the Business; (c) aid any other Person attempting to take customers, clients, dealers, suppliers or accounts from the Business; (d) aid any other Person in discouraging, in any way or for any reason, any active prospective customers, clients, dealers or suppliers of the Business from becoming a customer, client, dealer, supplier or account of the Business; (e) serve or

---

[19] Pls. Richard Parks, et al.'s Aff. of Steven Parks Supp. Mot. for Prelim. Inj., Ex. 5, at PARKS MANUFACTURING0000052–53 [such exhibit hereinafter "Noncompete Ag."].
[20] Including the Plaintiffs.

work in any way for any customers, clients, dealers, suppliers or accounts of the Business . . . [21]

The Agreements each select Delaware as the governing law.[22] The Asset Purchase Agreement, which enabled the broader Transaction, also selected Delaware as the governing law.[23]

In addition to the language of the contracts, the reader will be aided by additional context pertaining to the Transaction. The Transaction was generally structured as follows: The Plaintiffs, along with other family members, worked for and owned Parks Inc., an Oklahoma corporation.[24] Horizon developed an interest in Parks Inc. and, following negotiations, formed Parks LLC, a Delaware limited liability company with a principal place of business in Oklahoma, to facilitate an acquisition.[25] Parks LLC acquired substantially all of the assets of Parks Inc., though notably no Oklahoma equity, via the Asset Purchase Agreement executed on July 21, 2017.[26] Parks LLC remains the operating company that carries out the boat-building business acquired from Parks Inc.[27]

---

[21] *Id.* at Ex. 7, at PARKS MANUFACTURING0000092–93 [such exhibit hereinafter "Operating Ag."].

[22] Noncompete Ag. at PARKS MANUFACTURING0000057; Operating Ag. at PARKS MANUFACTURING0000106.

[23] APA, at PARKS MANUFACTURING0000038.

[24] *See* Defs. OB 5.

[25] *See* Pls. OB 5–6.

[26] *See* APA; *see also* Joint Stipulation Resp. to Ct.'s June 15, 2022 Letter, Dkt. No. 110; Defs. OB 5–6.

[27] Defs. OB 5–6.

PMI LLC, a manager-managed Delaware limited liability company, was formed in May 2017.[28] Horizon is the manager of PMI LLC; the members of PMI LLC are the Plaintiffs, another individual named Timothy Long, Fishtoon Partners, LP, and Horizon.[29] The Operating Agreement, which outlines the governance of PMI LLC, was effective as of July 19, 2017.[30]

PMI LLC in turn is the parent company and sole member of Parks LLC.[31]

The parties disagree as to what connection there is between PMI LLC and its members and the broader Transaction.[32] Resolution of that issue is not necessary to my limited decision here.

Certain other agreements were entered into between the Plaintiffs and various Defendants around this same time period.[33] Particularly—and named as a closing

---

[28] *See id.* at 6; Defs. Answer to Verified Compl., Affirmative Defenses, and Verified Countercls. ¶ 7, Dkt. No. 12. The Answer indicates that PMI LLC was formed on May 5, 2017, while the Defendants' opening brief indicates it was formed in July 2017. *Id.*; Defs. OB 6. The Plaintiffs' opening brief supports the May date, so I have used that date above. *See* Pls. OB 4.

[29] Defs. OB 6; Operating Ag. at PARKS MANUFACTURING0000119.

[30] Pls. OB 5.

[31] Defs. OB 6.

[32] The Plaintiffs' position appears to be that they were *required* to invest in PMI LLC as part of the Transaction. *See* Pls. OB 37 ("Plaintiffs received less value from Parks LLC, and were required to and did reinvest most of it in PMI [LLC]."). The Plaintiffs have also, in somewhat contradictory fashion, argued that the Transaction and the PMI LLC Agreement were *not* so entangled as to fall afoul of an Oklahoma statute allowing for certain restraints of trade in connection with a sale of goodwill. *See id.* at 50. The Defendants suggest that the PMI LLC Operating Agreement was an independent investment separate from the Transaction. *See, e.g.*, Defs. OB 1 (enumerating the Transaction and the investment in PMI LLC as separate transactions (1) and (2)); *see id.* at 13 (describing the Plaintiffs' position as "nonsense"). But I note that per the Defendants' opening brief, the letter of intent that gave rise to the Transaction anticipated the Plaintiffs' investment in PMI LLC. *Id.* at 7.

[33] *See, e.g.*, Pls. OB 6–18.

11

deliverable in the Asset Purchase Agreement—the Plaintiffs entered into employment term sheets with Parks LLC.[34]  The employment agreements select Oklahoma as the governing law.[35]

The parties also disagree as to whether and to what extent the Noncompete Agreement between the Plaintiffs and Parks LLC "relate[] to" the Parks' previous employment with Parks LLC.[36]

## II. ANALYSIS

The cross-motions are before me in a summary judgment posture.  Summary judgment may only be granted where the movant has demonstrated that there are no genuine issues of material fact and that she is entitled to judgment as a matter of law.[37]  The filing of cross-motions for summary judgment does not alter the applicable standard of review; further, the existence of cross-motions "does not act *per se* as a concession that there is an absence of factual issues."[38]  Parties moving for summary judgment in the context of cross-motions only concede the absence of factual issues and the truth of the non-movant's allegations *for purposes of their own*

---

[34] *Id.* at 7.

[35] *Id.*

[36] That is, the Plaintiffs essentially characterize the Noncompete Agreement as a condition of their *employment*.  *Id.* at 8 ("In connection with their employment . . . the Parks Brothers each signed a [Noncompete] Agreement with Parks LLC as a condition to their employment with Parks LLC[.]"). The Defendants characterize the Noncompete Agreement as a condition to entry into the broader *Transaction*.  *See* Defs. OB 9.

[37] *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997).

[38] *Id.*

*motion only*, and do not waive their right to assert the existence of disputed facts that preclude summary judgment in favor of the other party.[39]

The choice of law question before me, which might appear deceptively simple, spawns a rather lengthy analysis. Delaware choice of law cases first pose the question of whether any actual conflict exists between the two states' laws put forth by the parties.[40] If an actual conflict exists, Delaware cases then apply the Restatement (Second) of Conflict of Laws (the "Restatement"), using Section 187 to determine whether a second state's law might supplant a first state's law where the latter had been expressly selected by the parties.[41] One way in which a second state's law might supplant the expressly chosen state law is where that second state has a "materially greater interest" in the particular issue—here the restrictive covenants.[42]

To assess which state has the greater interest, Delaware caselaw follows the "most significant relationship" test, which stems from Section 6 of the Restatement.[43] Section 6 contains numerous broad-strokes factors that can help to determine which state has the most significant relationship, but the inquiry does not end there. The Restatement also includes Section 188, which provides a context-

---

[39] *Id.* (emphasis added).
[40] *See AG Res. Holdings, LLC v. Terral*, 2021 WL 486831, at *4 (Del. Ch. Feb. 10, 2021) (citing *Focus Fin. Partners*, 241 A.3d at 814).
[41] *See id.*
[42] In addition to satisfying the other factors of Restatement § 187(2). *See* Restatement § 187(2).
[43] *Certain Underwriters at Lloyds v. Chemtura Corp.*, 160 A.3d 457, 459 (Del. 2017).

13

specific application of the most significant relationship test as relates to *contracts.* Like Section 6, Section 188 also contains a number of factors to be weighed in assessing each state's relative interest; Section 188's factors are more narrowly directed towards the contract at issue.

Three different iterations of covenant restriction are at issue here. The first forbids solicitation by the Plaintiffs of Parks LLC or PMI LLC employees,[44] embodied in both of the Agreements. I find no conflict between the laws of Oklahoma and Delaware here, and thus respect the choice of the contracting parties, finding that Delaware law is applicable. The enforceability of the other restrictions, involving solicitation of business and noninterference with business, I conclude will result in different outcomes, dependent on choice of law. I therefore turn to the Restatement. As I discuss below, a treatment of Section 188 of the Restatement under the facts available to me does not counsel particularly strongly for either outcome—Delaware or Oklahoma law—here.

Ultimately, an assessment of case law in combination with the broader factors found in Section 6 of the Restatement convinces me that Oklahoma public policy, on these facts, does not override the parties' choice of law, and I must apply Delaware law to each of the restrictive covenants at issue here.

---

[44] The Noncompete Agreement forbids solicitation of Parks LLC employees while the Operating Agreement forbids solicitation of PMI LLC employees. *See* Operating Ag. § 8.9; Noncompete Ag. § 3(c).

As I have said, the Restatement in various subsections guides my analysis of the choice of law question. Before reaching any of the substance of the analysis, I note as a threshold matter that the Restatement provides that a Court is "not bound to decide all issues under the local law of a single state."[45] I thus analyze the Agreements on a provision-by-provision, rather than agreement-by-agreement, basis.

*A. Choice of Law*

1. <u>Is There an Actual Conflict Between Delaware and Oklahoma Law?</u>

To resolve the cross-motions' choice of law issue, I must first ask whether there is an actual conflict between the two states' laws championed here: Oklahoma and Delaware.[46] It is evident that a *public policy* conflict exists. Delaware law prizes freedom of contract, "presum[ing] that parties to a contract specifying choice of law meant what they said when they said it,"[47] and would find the restrictive covenants in the Agreements enforceable at least in part.[48]

Oklahoma public policy is strikingly different, with statute providing in general that "'[e]very contract by which any one is restrained from exercising a

---

[45] *Focus Fin. Partners*, 241 A.3d at 803 (quoting Restatement § 188 cmt. d) (internal quotations omitted).
[46] *AG Res. Holdings*, 2021 WL 486831, at *4.
[47] *Id.*
[48] Whether the full scope of the provisions would be enforceable is a different question.

lawful profession, trade or business of any kind' is void,"[49] except as provided by further statute.  Section 219 of the Oklahoma statutes makes exceptions for certain restrictive covenants, stating:

> 219(A).  A.  A person who makes an agreement with an employer, whether in writing or verbally, not to compete with the employer after the employment relationship has been terminated, shall be permitted to engage in the same business as that conducted by the former employer or in a similar business as that conducted by the former employer as long as the former employee does not directly solicit the sale of goods, services or a combination of goods and services from the established customers of the former employer . . . .

> 219(B).  A contract or contractual provision which prohibits an employee or independent contractor of a person or business from soliciting, directly or indirectly, actively or inactively, the employees or independent contractors of that person or business to become employees or independent contractors of another person or business shall not be construed as a restraint from exercising a lawful profession, trade or business of any kind.[50]

However different the public policies of the two states might be, the pertinent inquiry is whether an *actual* conflict exists.  With respect to the Employee Nonsolicit Provisions, it appears that no conflict exists between Delaware and Oklahoma law. Delaware law would find the nonsolicitation provisions in question to be facially

---

[49] *Berry & Berry Acquisitions*, *LLC v. BFN Props., LLC*, 416 P.3d 1061, 1069 (Okla. 2018) (citing OKLA. STAT. ANN. tit. 15, § 217).
[50] OKLA. STAT. ANN. tit. 15, §§ 219(A), 219(B).

16

enforceable.    So too would Oklahoma, per Section 219(B), which takes nonsolicitation of employees *out* of the broader rule that restraints on trade are disfavored.

No conflict exists with respect to the Employee Nonsolicit Provisions, and therefore the selected governing law in the broader Agreements—i.e., Delaware law—will apply to the construction of those provisions.  Notably, the Employee Nonsolicit Provisions are *their own separate subsections* within the broader "Nonsolicitation" subsections in both Agreements (perhaps not well-named); the decision that Delaware law applies, therefore, speaks with respect only to Section 3(c) of the Noncompete Agreement and Section 8.9(c) of the Operating Agreement.

Facially, however, the two other issues before me—the law applicable to the noninterference provisions with respect to common "supply chain" usage, and the law applicable to the nonsolicit and noninterference provisions relating to Plaintiff Steven Parks's marketing efforts in favor of another boat dealership—might resolve differently depending on whether Delaware or Oklahoma law is applied to the facts once they are developed.  Each is a restraint on a lawful profession (marketing) or trade (obtaining materials for a separate business), and no Oklahoma statute carves these restraints back out of the state's broader policy *against* restraints on trade. Thus, an actual conflict exists with respect to the law as applied to the

17

Noninterference Supply Chain Provisions and the Noninterference Marketing Provisions.

Finally, I note that, so far as I can tell from the briefing before me, the singular issue currently implicated by the Noncompete Agreement is the interpretation of the Employee Nonsolicit Provisions. The text of the restrictive covenants in the Noncompete Agreement does not appear to reach either the supply chain allegations or the marketing allegations. The provisions in the Noncompete Agreement focus on restricting the Plaintiffs' behavior with respect to *customers, clients, or accounts* of Purchaser (Parks LLC).[51] To my read, neither Grand Pools's competing for goods from a Parks LLC *supplier n*or Steven Parks's marketing the sale of a *dealership* selling Parks LLC's products is restricted by language addressing customers, clients, or accounts of Parks LLC. I therefore do not consider the Noncompete Agreement, and the attendant choice of law, any further than I have here.

The text of the Operating Agreement, though, does purport to restrict the Plaintiffs' activities with respect to dealers and suppliers. I turn now to a consideration of the appropriate choice of law as relates to the Operating Agreement's restrictive covenants.

---

[51] *See* Noncompete Ag. §§ 2–4.

2. Choice of Law Principles

Having determined that an actual conflict exists with respect to the laws that could apply to the Noninterference Supply Chain Provisions and the Noninterference Marketing Provisions, I now follow the Restatement in addressing the choice of law question.[52] The Restatement provides that where contractual counterparties have selected a particular jurisdiction's law to govern an agreement, that law will apply, unless either

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of Section 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.[53]

As I have noted above, the law selected to govern the Operating Agreement is Delaware law. The Plaintiffs therefore have to demonstrate that the Operating Agreement fits into either prong (a) or (b) of Section 187 of the Restatement to escape the application of Delaware law.

---

[52] *Focus Fin. Partners*, 241 A.3d at 803 (citing *Chemtura*, 160 A.3d at 464).
[53] *Id.* at 803–04; Restatement § 187(2).

The provisions in question appear in the Operating Agreement of a Delaware LLC. The Plaintiffs do not, therefore, argue that subsection (a)—lack of any substantial relationship to the chosen state—applies.[54] Instead, the Plaintiffs have argued that their case fits into prong (b).

The default under the Restatement is that the contractual choice of law—here Delaware—applies. For the Plaintiffs to obtain the result they seek here, they must demonstrate (1) that applying Delaware law would be contrary to fundamental Oklahoma policy, (2) that Oklahoma has a "materially greater interest" than Delaware as to the restrictive covenants in the Operating Agreement, and (3) that Oklahoma, "under the rule of Section 188 [of the Restatement]," would be the applicable law in the absence of a choice of law provision.[55]

Again, the Operating Agreement is the foundational operating document of a Delaware limited liability company. Obviously, Delaware has a strong interest in much of the agreement. But I must look specifically at the covenants at issue here, and at the respective states' interests *in those provisions.*

Delaware choice of law cases follow the "most significant relationship" test, based on Section 6 of the Restatement, to identify which state has the superior

---

[54] It is evident that Delaware has a substantial relationship to the parties to the Operating Agreement—as the Operating Agreement is the governing document of a Delaware entity.
[55] Restatement § 187(2)(b).

interest.[56]  Section 6 outlines the below factors as relevant to the choice of law analysis:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.[57]

Other sections of the Restatement identify how these factors should be assessed in a given context.  Section 188 of the Restatement, in particular, addresses contractual disputes, and lays out the following further factors for consideration:

> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and
> (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

> These contacts are to be evaluated according to their relative importance with respect to the particular issue.[58]

My analysis of the Section 188 factors is difficult, given the nature of the contract at issue—an entity's governing document rather than a commercial or employment contract.

---

[56] *See Chemtura*, 160 A.3d at 464.
[57] Restatement § 6(2).
[58] *Id.* § 188(2).

The Plaintiffs submit that they negotiated and signed all contracts pertinent to the Transaction in Oklahoma,[59] but the Defendants do not provide facts regarding the place of negotiation or contracting. I assume for purposes of analysis that the place of negotiation was Oklahoma. The Restatement notes that the place of contracting is, standing alone, a "relatively insignificant contact."[60] Still, without facts pointing in the direction of Delaware, factors (a) and (b) must counsel (if only weakly) for the application of Oklahoma law.

The place of performance and the location of the subject matter of the contract are, per the Restatement, more significant factors, but are difficult to assess here given the nature of the contract.[61] The covenants are written to apply without territorial limitation—they certainly can be expected to be performed in Oklahoma, but not exclusively so. In fact, one of the acts alleged here as in breach is the marketing of a boat dealership located in *Texas*. I find these factors are inconclusive.

The facts regarding factor (e)—the residence or location of the contracting parties—are easy to confirm but split in multiple directions. The parties to the Operating Agreement are Fishtoon Partners, LP, a Delaware limited partnership; Horizon, a California limited liability company; the Plaintiffs; and a third individual, Timothy Long, whose domicile is not disclosed in the record. The Plaintiffs are

---

[59] *See* Pls. Richard Parks, et al.'s Aff. of Steven Parks Supp. Mot. for Prelim. Inj., ¶ 14.
[60] Restatement § 188(2) cmt. e.
[61] *See id.*

Oklahoma citizens,[62] while Horizon is a California citizen and Fishtoon is a Delaware citizen.[63] PMI LLC itself is incorporated in Delaware, though its "headquarters and all operations are located" in Oklahoma.[64] This factor is also inconclusive.

The contacts described by the five-factor Section 188(2) are not terribly helpful with respect to the choice of law analysis here; for further guidance, I turn to case law dealing with choice of law in the context of a Delaware LLC agreement. As this Court has noted, "a Delaware LLC can select the law of a different jurisdiction to govern its LLC agreement."[65] The Delaware LLC Act "makes clear that Delaware's interest is not inherently paramount, precisely because parties can select the law of another state to govern an LLC agreement."[66] Where the internal affairs doctrine has been implicated by claims arising from a Delaware LLC agreement, this Court has not hesitated to apply Delaware law despite a choice of law challenge: "Delaware maintains a 'significant and substantial interest in overseeing the conduct of [Delaware] corporate fiduciaries' . . . . [D]etermining

---

[62] *See* Pls. OB 3–4.
[63] *See* Operating Ag.
[64] Defs. Answer to Verified Compl., Affirmative Defenses, and Verified Countercls. ¶ 7, Dkt. No. 12.
[65] *Focus Fin. Partners*, 241 A.3d at 809.
[66] *Id.* at 810.

whether [a party] acted in good faith, in line with his contractual fiduciary duties, is quintessentially an internal affairs question," such that Delaware law should apply.[67]

However, the allegations before me are not similar to a claim of breach of fiduciary duty; the allegations here arise out of restrictive covenants embedded within an LLC agreement. The restrictive covenants' presence within an LLC agreement does not mean the allegations are necessarily internal affairs questions; here, I find, they are not.[68] The covenants are instead aimed at restricting any interference by the Plaintiff-sellers with the post-sale business.

---

[67] *See AG Res. Holdings*, 2021 WL 486831, at *6 (citation omitted).

[68] *Focus Financial Partners*, in dicta, mused that choice of law applicable to provisions of a unit compensation agreement associated with a Delaware limited liability company but signed by a California employee was an "interesting question," although the Court did not ultimately need to make a finding as to the applicable law. *Focus Fin. Partners*, 241 A.3d at 811. In its discussion of the question, the Court looked beyond the citizenship of the limited liability company, noting that the "terms of the Unit-Related Provisions make clear that they are a form of compensation linked to [the party's] employment," and that the applicable vesting schedule for the units was tied to the party's *employment status*, rather than his rights as a unit holder. *Id.* at 810–11. The linkage between the party's employment and his receipt of units, per the *Focus Financial Partners* Court, gave rise to a "significant interest" on behalf of California due to "the status of the units as a method of compensating an employee who lived and predominantly worked in California." *Id.* at 810.

By contrast, the provisions of the Operating Agreement here do not appear to be tied to the Plaintiffs' status as employees of Parks LLC. For example, the definition of "Restrictive Period" in the Operating Agreement refers to "the period in which each Member owns Units" plus the immediately following five years, rather than a period of time following termination of employment. Operating Ag. § 18.63. The consideration provided in exchange for units in PMI LLC was not employment, but an investment in the company in addition to the restrictive undertakings of the Operating Agreement. *Id.* § 17.13.

The *Focus Financial Partners* Court also considered whether the restrictive covenants in a (different) agreement "ma[d]e sense as restrictions on [the party] in his capacity as a holder of units," concluding that they did not: "each of the Employment-Related Provisions seeks to constrain [the party's] ability to take advantage of relationships and knowledge that he developed *in his capacity as an employee*." *Focus Fin. Partners*, 241 A.3d at 812 (emphasis added). Here, by contrast, the Parks's brothers expertise was, I assume, largely acquired pre-Transaction, and

24

In sum, the Operating Agreement is not an agreement for the employment of the Plaintiffs in Oklahoma seeking to import Delaware law as a workaround of Sooner prohibitions on certain restrictive covenants.[69] Such a choice of law would likely be unenforceable under Restatement principles.[70] Instead, the Operating Agreement represents membership interests in a Delaware LLC received by the Plaintiffs at least partially in return for the sale of corporate assets from the Plaintiffs' family business, and certain limitations placed on the members in aid of the LLC's business.

I assume that Oklahoma's policies against restraints on employment and conduct of business are "fundamental."[71] That satisfies one of three factors sufficient, under the Restatement, to set aside the parties' choice of law. Nonetheless, as described above, Section 188 of the Restatement is not conclusive here. In other words, the Plaintiffs have not shown that Oklahoma law would apply to the covenants, absent the designation of Delaware law in the Operating Agreement, pursuant to Section 188. Finally, given the nature of the Operating Agreement, I do not find that the record demonstrates the remaining Restatement factor necessary to negate the parties' choice of law—that Oklahoma has a

---

thus pre-employment in the resulting LLC. The rationale of *Focus Financial Partners* is not persuasive here, in that respect.

[69] As noted above, the Plaintiffs entered into *separate* Employment Agreements in connection with the Transaction. *See supra* note 34.

[70] *See, e.g., Ascension,* 2015 WL 356002, at *5; *Focus Fin. Partners*, 241 A.3d at 824.

[71] Restatement § 187(2)(b).

25

materially greater interest in the operation of the covenants of the Operating Agreement than does Delaware.

The question before me is whether the interests of the competing jurisdiction are sufficient to overcome the default, which is the recognition of the intent of the parties as described in the contract. A review of the general principles of Section 6 of the Restatement convinces me that the overarching primacy of Delaware's interest in its own entities must carry the day. Section 6 counsels in favor of the protection of justified expectations, certainty, predictability, and uniformity of result, and the relative interests of the states in the determination of the particular issue.[72] Each of these factors points in favor of the application of Delaware law to covenants *designed to protect a Delaware LLC*. Oklahoma surely has an interest in restraints on its citizens' ability to engage in trade. But the Plaintiffs have not shown that Oklahoma's interest dominates over Delaware's such that I should displace the parties' choice of law as selected in the Operating Agreement.

Delaware law, then, applies to each of the applicable sets of provisions before me.

*B. Enforceability of the Applicable Provisions*

The parties have, by way of Amended Joint Memorandum, also asked me to opine in this expedited phase of the action on the enforceability of the restrictive

---

[72] *Id.* § 6(2).

covenants, in light of my decision on choice of law.[73]  This is a matter that must be considered in light of the facts of record, including whether the actions of the Plaintiffs have in fact breached the nonsolicitation and noninterference covenants of the Operating Agreement, as well as the enforceability of the particular covenants in light of Delaware law.  Because the record is at present insufficiently developed to produce answers to these questions that would be other than hypothetical and advisory, I do not address the enforceability issues further here.

## III. CONCLUSION

The law applicable to the Employee Nonsolicit Provisions, the Noninterference Supply Chain Provisions, and the Noninterference Marketing Provisions is Delaware law.  It is SO ORDERED.

The parties should meet and confer and inform me of remaining issues following this Memorandum Opinion.

---

[73] Am. Joint Mem. Regarding Procedural Posture for Addressing Restrictive Covenants and Stipulation, Dkt. No. 107.